**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CHRISTOPHER IRIZARRY,**

                      **Plaintiff,**

  vs.                                                           9:10-cv-1022
                                                                   (MAD/DRH)

**S. CORKNARD,** Corrections Officer, Coxsackie Correctional Facility; **ROBERT DAVIES, III,** Corrections Officer, Coxsackie Correctional Facility; **DIXON,** Corrections Officer, Coxsackie Correctional Facility; **FERNANDEZ,** Corrections Officer, Coxsackie Correctional Facility; **K. GIORGIANNI,** Registered Nurse, Coxsackie Correctional Facility; **STEVEN GRIMALDI,** Corrections Officer, Coxsackie Correctional Facility; **MARK HARRIS,** Corrections Officer, Coxsackie Correctional Facility; **J. PLIENS,** Registered Nurse, Coxsackie Correctional Facility; and **JASON T. YUNG,** Sergeant, Coxsackie Correctional Facility,

                      **Defendants.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **STOLL, GLICKMAN & BELLINA, LLP**<br>71 Nevins Street<br>Brooklyn, New York 11217<br>Attorneys for Plaintiff | **CYNTHIA H. CONTI-COOK, ESQ.** |
| **OFFICE OF THE NEW YORK**<br>**STATE ATTORNEY GENERAL**<br>The Capitol<br>Albany, New York 12224<br>Attorneys for Defendants | **ADRIENNE J. KERWIN, AAG** |

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

On August 24, 2010, Plaintiff *pro se* commenced the present civil rights action. After the lifting of a court-ordered stay, Defendants filed their answer on December 1, 2010. Following the expiration of the discovery deadline, the July 2, 2011 dispositive motion deadline was extended to August 2, 2011, at Defendants' request. Thereafter, on August 2, 2011, Defendants filed a motion for summary judgment. Plaintiff was granted an additional thirty days to respond to Defendants' motion for summary judgment and, on September 19, 2011, Plaintiff served his opposition to Defendants' motion.

On November 7, 2011, Ms. Cynthia Conti-Cook filed a notice of appearance on Plaintiff's behalf. On that same day, Plaintiff, through counsel, submitted a letter motion requesting that the Court "(1) reserve any decision on the summary judgment motion currently pending before the Court, (2) . . . strike *pro se* plaintiff's response to defendants' motion for summary judgment filed September 19, 2011, (3) . . . allow plaintiff to amend his complaint and (4) reopen discovery so that plaintiff may conduct defendants' depositions." *See* Dkt. No. 44 at 1. On November 28, 2011, the Court denied Plaintiff's motion to amend the Complaint, but granted his motion to strike his response to Defendants' motion for summary judgment and granted Plaintiff's motion to reopen discovery for limited purposes. *See* Dkt. No. 46. In light of this, the Court reset the dispositive motion deadline.

Currently before the Court is Defendants' renewed motion for summary judgment. *See* Dkt. No. 48.

## II. BACKGROUND

On July 26, 2009, around 11:05 a.m., Plaintiff and other inmates from cell block "A-3" were lined up with Defendant Grimaldi in anticipation of entering the mess hall when Defendant Yung ordered Plaintiff to step out of line to be searched. *See* Dkt. No. 50-2 at ¶ 1; Dkt. No. 1 at ¶¶ 1-4. Plaintiff claims that he complied with Defendant Yung's orders, but that Defendant Yung still complained about Plaintiff's poor attitude and ordered him "keeplocked." *See* Dkt. No. 50-2 at ¶ 2; Dkt. No. 1 at ¶ 7. Plaintiff was subsequently pat frisked and sent back to his cell.

Several minutes later, Plaintiff observed Defendants Ung, Grimaldi, Davies and Harris talking to one another. *See* Dkt. No. 1 at ¶¶ 9-11. Shortly thereafter, Defendant Grimaldi approached Plaintiff's cell with a tray of food. *See id.* at ¶ 12. Defendant Davies opened the door to Plaintiff's cell and Defendant Grimaldi entered it. *See id.* This is where the parties' version of events diverge.

### A.     Plaintiff's accounts of July 26, 2009

Upon entering Plaintiff's cell, Defendant Grimaldi threw the tray of food at Plaintiff and began punching him in the head and face, and berated him for challenging Defendant Yung's authority. *See* Dkt. No. 1 at ¶ 13. Defendant Harris then entered the cell and when Plaintiff asked him to stop the assault, he instead joined Defendant Grimaldi in punching Plaintiff in the head and face several times. *See id.* at ¶¶ 14-16. Defendant Harris also grabbed Plaintiff's hot pot and struck him in the head with it, knocking him unconscious for a period of time and splitting his head open. *See id.* at ¶ 17. At this point, Defendant Harris grabbed Plaintiff's leg, twisting it while he was laying prone on the ground. *See id.* at ¶ 18. Defendant Davies also entered the cell and struck Plaintiff in his back, arms, legs, and head with a baton. *See id.* at ¶ 19.

At this point, Plaintiff pleaded with Defendant Roach to order his men to stop the attack, but Defendant Roach simply looked on. *See id.* at ¶ 20. Soon thereafter, Defendants Fernandez and Corknard arrived on the scene and kicked Plaintiff in the head and face while Defendant Harris sat on Plaintiff's back to keep him restrained. *See id.* at ¶¶ 22-23. At this point, Defendant Yung arrived on the scene and kicked Plaintiff in the head and face, causing abrasions. *See id.* at ¶ 24. Defendants Fernandez and Corknard eventually escorted Plaintiff from his cell, punching him and slamming his body into the walls. *See id.* at ¶ 25. Defendant Dixon had a camera and was supposed to document the events unfolding; however, he did not turn on the camera until they had reached a section of the facility where there were additional security cameras also filming the transport. *See id.* at ¶¶ 26-27.

During Plaintiff's deposition, he provided a slightly different version of the July 26, 2009 incident. Plaintiff restates his encounter with Defendant Yung in the mess hall line which resulted in him being keeplocked and escorted back to his cell. *See* Dkt. No. 38-3 at 8-15.[1] Plaintiff observed Defendants Yung, Harris, Davies and Grimaldi speaking with one another and presumed that they were devising a plan to assault him. *See id.* at 17-19. Thereafter, Defendant Grimaldi arrived at Plaintiff's cell with the tray of food and he entered the cell and shoved the tray into Plaintiff's chest before he began throwing punches, which Plaintiff was able to block. *See id.* at 18-21. As Defendant Grimaldi continued to advance on him, Plaintiff curled up into a ball on his bed in an effort to protect himself. *See id.* at 21. At this point, Defendant Harris came into the cell and hit Plaintiff with his hot pot, breaking it over his head. *See id.* Thereafter, Defendant Harris threw Plaintiff to the floor, which is how he claims that he hurt his knee. *See id.* at 22.

---

[1] In order to avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

Defendants Harris and Grimaldi continued to assault Plaintiff after he was thrown to the floor. *See id.* at 21-24.

Plaintiff claims that while he was laying face down on the floor, Defendant Grimaldi punched him on the side of his face and his eye. *See id.* at 23. Defendants Davies and Harris then continued to assault Plaintiff with their batons. *See id.* at 23-24. After about ten minutes from when the incident first started, Defendants Fernandez and Corknard arrived and began kicking Plaintiff in the face. *See id.* at 24-26. Plaintiff also recounts that Defendant Roach had arrived just prior to Defendants Fernandez and Corknard and observed Defendants assaulting him. *See id.* at 27. Just prior to being escorted from his cell, Plaintiff saw Defendant Yung who kicked Plaintiff in the chest as he was slumped over in an attempt to walk to the infirmary. *See id.* at 29-32. Plaintiff claims that the entire assault lasted approximately twenty minutes and that, although Defendant Dixon had a camera with him for the entire time, he did not start videotaping the incident until they had arrived in the hallway for transport to the infirmary. *See id.* at 32.

**B.    Defendants' accounts of July 26, 2009**

At approximately 11:40 a.m., Defendant Grimaldi opened Plaintiff's cell door to provide him with lunch. *See* Dkt. No. 38-3 at 78. Plaintiff punched Defendant Grimaldi in the face with his right fist and, as Defendant Grimaldi attempted to defend himself and restrain Plaintiff, Plaintiff continued punching him in the head and face. *See id.* at 78, 86. At this point, Defendant Davies activated an alarm, responded to the situation, gave Plaintiff orders to stop, and then attempted to restrain him. *See id.* at 78. Plaintiff refused to comply and struck Defendant Davies in the right eye. *See id.* Defendant Davies then struck Plaintiff five or six times on the head and upper body and then struck him another three or four times with his baton. *See id.* at 78, 88.

At this point, Defendant Harris entered the cell and, when Plaintiff still refused to comply with Defendants' orders to stop fighting, struck Plaintiff, pulled him into a prone position, and applied mechanical restraints. *See id.* at 78, 87. Defendant Yung arrived just prior to Plaintiff being placed in the mechanical restraints and, once the restraints were in place, Defendant Dixon was called in to operate the handheld camera. *See id.* at 85. Defendant Corknard and Fernandez then escorted Plaintiff to the infirmary without incident. *See id.* at 81, 90-91, 94. Defendant Roach responded to the alarm as well, retained custody of Plaintiff, and ordered that Defendants Grimaldi, Harris and Davies report to the infirmary for medical evaluation and treatment. *See id.* at 84.

While at the infirmary, Defendant Roach questioned Plaintiff about the incident. Plaintiff stated that Defendant Yung keeplocked him, that Defendant Grimaldi approached his cell with a tray of food and assaulted him upon entering the cell, and that the other Defendants eventually joined the assault by punching, kicking, and hitting him with batons. *See id.* at 84-85. Plaintiff was subsequently issued a misbehavior report for failing to follow a direct order, assaulting staff members, creating a disturbance, interfering, and exhibiting violent conduct. *See id.* at 91.

**C.     Plaintiff's medical treatment**

Defendant Dixon filmed Plaintiff being escorted to the infirmary. *See id.* at 154-55. The video shows Plaintiff walking, unassisted and with some appreciable abnormality. *See id.* The tape also captured Plaintiff standing unassisted and undressing with slight difficulty for photographs to be taken to document his injuries. *See id.* at 154-55, 157-60.

Upon arrival at the infirmary, Plaintiff complained about bruises on his face and head, a cut near his eye, lacerations on his face, pain in his arms, back, mouth and jaw, and a fractured

6

knee. *See id.* at 34-36; Dkt. No. 38-4 at ¶ 4. Defendant Giorgianni noted Plaintiff's injuries as follows:

> [u]pon examination, the plaintiff was alert and oriented times three and had (1) a black and blue area on the right side of his forehead, (2) red and discolored areas on the back left side of his head, (3) an approximate 3/8 inch cut on the outer edge of his right eye, (4) several red marks on the back of his left upper arm and (5) an abrasion on the back of his right forearm. He had normal range of motion while dressing, but appeared slightly stiff with head movement when the laceration around his eye was treated. He also did not fully open his mouth while speaking.

*See* Dkt. No. 38-4 at ¶ 5; Dkt. No. 38-3 at 96-98; Dkt. No. 50-1 at ¶ 10.

Defendant Giorgianni also treated Defendants Grimaldi, Harris and Davies for injuries they sustained during the incident. *See* Dkt. No. 38-4 at ¶ 9. Defendant Harris' right thumb was swollen and immobile and he had a cut on his left hand. *See id.* at ¶ 10. The left side of Defendant Grimaldi's face was red and swollen, and his right eye was swollen and bruised. *See id.* at ¶ 11. Defendant Grimaldi also had a bump on his head, a cut inside his left cheek, and complained of left elbow pain. *See id.* Defendant Giorgianni recommended that Defendant Davies report to an emergency facility because his right eye lid was swollen and bruising, he had blood seeping from his right nostril, the right side of his face was numb, and he complained of pain in both hands. *See id.* at ¶ 12. At some point Plaintiff was seen by a physician and his knee was x-rayed, which showed no evidence of fracture. *See* Dkt. No. 38-3 at 47-48; Dkt. No. 39 at 11.

### D.    **Defendants' motion for summary judgment**

Defendants raise the following arguments in support of their renewed motion for summary judgment: (1) Plaintiff failed to exhaust his administrative remedies as to his claims against

Defendants Roach, Dixon, Pleines and Giorgianni; (2) Plaintiff's contradictory accounts of events require summary judgment in Defendants' favor; (3) Plaintiff cannot establish that Defendant Giorgianni or Defendant Pleines were deliberately indifferent to Plaintiff's serious medical needs; and (4) Plaintiff cannot establish a retaliation claim. *See* Dkt. No. 48-8.

### III. DISCUSSION

**A.     Summary judgment standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in

8

the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.     Relief under 42 U.S.C. § 1983**

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983).  Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained.  *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)).  As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions.  *See id.* (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

**C.     Plaintiff's retaliation claim and his claims against Defendants Roach, Dixon, Pleines and Giorgianni**

In his response to Defendants' motion for summary judgment, Plaintiff voluntarily dismisses his retaliation claim against Defendant Yung and all claims against Defendants Roach, Dixon, Pleines and Giorgianni.  *See* Dkt. No. 50 at 12, 21.  Accordingly, the Court grants Defendants' motion for summary judgment as to these claims.

9

**D.	Exhaustion**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal action. *See Booth*, 532 U.S. at 740-41. This "requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,'" and regardless of the subject matter of the claim. *See, e.g., Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (citation omitted). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *See id.* The failure to exhaust is an affirmative defense that defendants must raise. *See Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004) (citation omitted). As an affirmative defense, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *See Giano*, 380 F.3d at 675 (citation omitted).

In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court held that, for an inmate to exhaust his administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *See id.* (citation omitted). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006) (footnote omitted).

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). *See* 7 N.Y.C.R.R. § 701.5(a)(1) and (b). This grievance must be filed with the IGRC within twenty-one (21) calendar days of the alleged occurrence. *See id.* § 701.5(a). An inmate may appeal an adverse decision of

10

the IGRC to the Superintendent of the Facility. *See id.* § 701.5(c). An inmate may appeal an adverse decision at the Superintendent's level to the Central Office Review Committee ("CORC"). *See id.* § 701.5(d). "To properly exhaust administrative remedies, an inmate must file an appeal with the CORC." *Torres v. Carry*, 672 F. Supp. 2d 338, 343 (S.D.N.Y. 2009) (citations omitted).

A prisoner has no independent duty to plead facts plausibly suggesting that he exhausted his available administrative remedies in order to state an actionable claim under 42 U.S.C. § 1983. *See Jones v. Bock*, 549 U.S. 199, 211-17 (2007). "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." *Id.* at 216. If a prisoner chooses to plead facts regarding exhaustion, and those facts plausibly suggest that he failed to exhaust his available administrative remedies, then his complaint may be dismissed for failure to state a claim. *See id.* at 215-16.

The Second Circuit has developed a "three part inquiry" to determine whether a court should excuse an inmate for failing to fulfill the PLRA exhaustion requirement. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citation omitted). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions which prevented the plaintiff from exhausting his administrative remedies estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *See id.* (quotation omitted).

In the present matter, the record shows that Plaintiff filed two grievances, one related to the alleged assault and another regarding the medical treatment that he was provided. Defendants contend that Plaintiff has failed to exhaust his administrative remedies because he did not name particular Defendants in his grievances. *See* Dkt. No. 48-8 at 6-8. These assertions, however, are

11

without merit. The Second Circuit has held that "it is plain that a New York state prisoner is not required to name responsible parties in a grievance in order to exhaust his administrative remedies." *Espinal v. Goord*, 558 F.3d 119, 126 (2d Cir. 2009). Therefore, because "New York's grievance procedures do not require prisoners to identify the individuals responsible for alleged misconduct, neither does the PLRA for exhaustion purposes." *Id.* at 127 (citation omitted). Plaintiff's grievances prompted investigations into the appropriateness of the use of force against him and fully satisfied the PLRA's exhaustion requirement, despite Plaintiff's failure to identify all allegedly responsible parties.

**E.     Excessive force**

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000).

To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *See Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson*, 503 U.S. at 9 (internal citations omitted); *Blyden*, 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation *per se*" regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9); *see also Wilkins v. Gaddy*, 130 S. Ct. 1175, 1178 (2010) ("The 'core judicial inquiry' . . . was not whether a certain quantum of injury was sustained, but rather

12

'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm'" (quotation omitted)). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims*, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate a "necessary level of culpability, shown by actions characterized by wantonness." *Sims*, 230 F.3d at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson*, 503 U.S. at 7). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] . . . the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Defendants rely on the rare exception articulated in *Jeffreys v. City of New York* to argue that Plaintiff's testimony is so contradictory, unsupported, and fanciful that "there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (explaining that credibility determinations are generally left to the jury but in "rare" circumstances there are times where the court can conclude that defendants have established there is no genuine issue of material fact).

13

The Second Circuit found this circumstance in the *Jeffreys* case, whereupon the plaintiff contended that he was beaten by one or more unidentified police officers prior to being thrown out a window by one of the officers. *See id.* at 551-52. Prior to the litigation, however, the plaintiff confessed to having jumped out of the window to three separate individuals: medical personnel responding to the scene, an interview with law enforcement the following day, and a corrections employee. *See id.* at 552. There were no reports of police misconduct and the earliest contact with any officers was after the plaintiff was on the ground outside the building. *See id.* Additionally, there were no medical reports that the plaintiff had been beaten prior to his fall. *See id.* at 552-53. Considering the plaintiff's contradictory accounts of the incident and any corroborating evidence to support his claims, the Second Circuit affirmed the district court's grant of summary judgment. *See id.* at 555.

In the present matter, while there are some discrepancies in the version of events Plaintiff has given throughout the litigation, and his testimony "is subject to serious question, it is not so blatantly false that the Court may simply reject it as a matter of law." *Moore v. Casselberry*, 584 F. Supp. 2d 580, 587 (W.D.N.Y. 2008). First, unlike the *Jeffreys* case, Plaintiff was able to identify the Defendants who were involved in an undisputed use of force incident. Although Defendants debate who started the altercation and how the events transpired, it is uncontroverted that Plaintiff was punched in the face and body, and that he was struck with a baton throughout the course of the incident. Therefore, Defendants have not provided an alternate version of the relevant events, just a different angle. *See Moore v. Casselberry*, 584 F. Supp. 2d 580, 585 (W.D.N.Y. 2008) (holding that "just because the plaintiff's claim is based solely upon his own contradictory and incomplete testimony . . . does not automatically entitle the defendants to summary judgment")

Second, unlike the *Jeffreys* case where no medical evidence corroborated the plaintiff's version of events, it is undisputed that Plaintiff sustained medical injuries because of Defendants' use of force. This is documented in the use of force report, the medical records, the photographs, and Defendants' declarations. While Plaintiff "may have exaggerated the extent of his injuries, or the severity of the assault, that does not mean that no assault occurred." *Id.* at 586 (citations omitted). Third, the "discrepancies between [Plaintiff's] deposition testimony and the allegations set forth in his complaint about the details of the alleged assault . . . go to the weight to be accorded to [Plaintiff's] testimony . . . but . . . are not so egregious as to render [Plaintiff's] testimony unbelievable as a matter of law." *Id.* at 587.

Finally, in his response to Defendants' renewed motion for summary judgment, Plaintiff submitted the affidavit of Isaac Dozier, an inmate who apparently witnessed part of the July 26, 2009 incident. *See* Dkt. No. 50-5. According to Mr. Dozier, he saw Defendant Yung pull Plaintiff out of the mess line and did not observe Plaintiff yell or threaten Defendant Yung during their exchange. *See id.* at ¶ 10. After Plaintiff was escorted back to his cell, Mr. Dozier alleges that he heard Defendant Yung tell another officer to "take care of that asshole" and that the officer nodded his head in agreement. *See id.* at ¶¶ 12-13. Further, Mr. Dozier alleges that he later observed two officers approach Plaintiff's cell and that the one officer threw a tray of food in Plaintiff's face and then punched him in the face. *See id.* at ¶ 20. Mr. Dozier further claims to have observed much of what Plaintiff claims occurred, including Defendants restraining Plaintiff while assaulting him and that Plaintiff did not "throw punches, kick, or assault any officers." *See id.* at ¶¶ 24-32.

Contrary to Defendants' assertions, Mr. Dozier's statements that contradict portions of Plaintiff's allegations do not warrant dismissing Plaintiff's case. These discrepancies will bear on

15

the weight afforded to Plaintiff's and Mr. Dozier's testimony and "are not so egregious as to render [Plaintiff's] testimony unbelievable as a matter of law." *Moore*, 584 F. Supp. 2d at 587.

As such, the Court finds that the *Jeffreys* exception is inapplicable to the present matter.

Moreover, issues of fact exist regarding the seriousness of Plaintiff's injuries. These injuries included a laceration which was bleeding and required bandaging, pain, and a swollen knee. Further, considering how they were acquired, when viewing the facts in the light most favorable to Plaintiff, also satisfies the subjective prong of the analysis. Finally, even if Plaintiff's injuries are not considered serious, construing the facts in the light most favorable to Plaintiff – *i.e.*, that he was assaulted, unprovoked, when his food was being delivered, that he was compliant with the officers' orders when they instructed him not to resist, and that they had him in the prone position quickly yet continued to assault him – the amount of continued force used could be malicious and constitute a *per se* Eighth Amendment violation. *See Blyden*, 186 F.3d at 263.

Based on the foregoing, the Court finds that issues of fact exist which preclude granting Defendants' motion for summary judgment.

**F.**     ***Heck v. Humphrey***

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that,

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

*Id.* at 486-87.

16

In *Douglas v. Smith*, No. 05-CV-1000, 2009 WL 789450 (N.D.N.Y. Jan. 26, 2009), the plaintiff asserted two excessive force claims against defendant Rae, both stemming from a June 30, 2004 altercation. *See id.* at *1. As a result of that same altercation, the plaintiff was charged with criminally assaulting a corrections officer, but pleaded guilty to the reduced charge of attempted assault in the second degree, "'and was sentenced as a second felony offender in accordance with the plea agreement to a prison term of 2 to 4 years, to be served consecutively to a sentence he was then serving.'" *Id.* (quoting *People v. Douglas*, 831 N.Y.S.2d 585, 586 (3d Dep't 2007)). The plaintiff's appeal of his guilty plea was denied. *See id.*

In granting the defendant's motion for summary judgment as to the plaintiff's claims against defendant Rae, the court found that, in pleading guilty to the attempted assault in the second degree charge, the plaintiff admitted that "he intended to prevent Rae from performing his lawful duty by attempting to cause Rae physical injury." *Id.* at *2 (citation omitted). The court held that the plaintiff's "contentions here that Rae initiated the assault and that Douglas was merely attempting to protect himself directly contradict his conviction based on his allocution and plea and mandates the implication of the invalidity of that conviction and appeal." *Id.* (citation omitted). Finally, the court held that if the plaintiff's version of the relevant facts were accepted, then defendant Rae "would not have been performing a lawful duty and [the plaintiff's] plea would become invalid." *Id.*

In the present matter, Plaintiff pled guilty to attempted assault in the second degree, in violation of N.Y. Penal Law § 120.05(3). *See* Dkt. No. 48-2 at 8. Plaintiff's allocution reads as follows:

> it is charged that on or about July 26th, 2009 at about 11:41 a.m. at the Coxsackie Correctional Facility . . ., you did, with intent to prevent a peace officer or a police officer from performing a lawful duty, cause physical injury to that peace officer, and that at the

17

> aforesaid date, time and place, July 26th, 2009 . . ., you did, with
> the intent to prevent Correction Officer Robert Davies, III, who is a
> peace officer, from stopping the defendant from striking Correction
> Officer Steven Grimaldi, did strike Officer Robert Davies, III, on
> the right side of his head with his fist causing Officer Davies
> physical injuries, including a fractured right orbit.

*See id.* Plaintiff was sentenced to two-to-four years of incarceration, to be served consecutively to the prison term he was already serving.

Nothing in the record indicates that Plaintiff's conviction was vacated or even appealed. As such, it appears that some of Plaintiff's claims may be barred under *Heck*'s favorable termination rule. *See Dye v. Virts*, No. 03-CV-6273, 2004 WL 2202638, *4 (W.D.N.Y. Sept. 28, 2004) (barring a prisoner's federal claims regarding a correction officer's alleged use of excessive force pursuant to *Heck* because (1) the plaintiff had previously "ple[d] guilty to assault in the second degree . . . for causing physical injury to [the corrections officer] in order to prevent him from performing a lawful duty," (2) the conviction had been affirmed on appeal, and (3) if the prisoner was merely defending himself, the corrections officer would not have been performing a lawful duty). Defendants, however, did not address this issue in their motion for summary judgment.[2]

In light of the Court's concerns regarding this issue, the Court directs Plaintiff to submit a letter brief, not to exceed five pages, within fourteen days of the date of this Memorandum-Decision and Order, addressing why *Heck v. Humphrey* does not preclude any of his claims. Defendants shall have seven days to respond.

---

[2] The Court notes that the Circuit Courts of Appeal disagree about whether a dismissal under *Heck* is for lack of subject matter jurisdiction or if it is for failure to state a claim. *Compare Mendia v. City of Wellington*, 432 Fed. Appx. 796, 797 n.1 (10th Cir. 2011) (holding that "dismissal under *Heck* is for failure to state a claim, which falls under Rule 12(b)(6)" (citations omitted); *with Best v. Kelly*, 39 F.3d 328, 330 (D.C. Cir. 1994) (holding that a dismissal under *Heck* is for lack of subject matter jurisdiction and, therefore, not a decision on the merits).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**, as set forth herein; and the Court further

**ORDERS** that Plaintiff's retaliation claim against Defendant Yung and all claims against Defendants Roach, Dixon, Pleines and Giorgianni are **DISMISSED**; and the Court further

**ORDERS** that Plaintiff shall submit, within **fourteen (14) days** of the date of this Memorandum-Decision and Order, a letter brief, not to exceed **five (5) pages**, addressing why *Heck v. Humphrey* does not preclude any of his claims. Defendants shall have **seven (7) days** to respond; and the Court further

**ORDERS** that the Clerk of the Court shall serve this Memorandum-Decision and Order on all parties in accordance with the Local Rules; and the Court further

**ORDERS** that Defendants' counsel shall initiate a telephone conference, using a professional conferencing service, with the Court and Plaintiff on **Thursday, April 5, 2012, at 10:00 a.m.**, to discuss a schedule for the trial of this matter. Counsel shall contact chambers at 518-257-1880.

**IT IS SO ORDERED.**

Dated: March 19, 2012
      Albany, New York

_____
Mae A. D'Agostino
U.S. District Judge

19